Biltmore Homes, Inc., et al. [1] v. Commissioner. Biltmore Homes, Inc. v. Commissioner
Docket Nos. 64634, 64872, 64873, 64943-64946.
United States Tax Court
T.C. Memo 1960-53; 1960 Tax Ct. Memo LEXIS 237; 19 T.C.M. (CCH) 268; T.C.M. (RIA) 60053; March 25, 1960
Charles F. Cooper, Esq., 4813 Forest Drive, Columbia, S.C., for the petitioners. George W. Calvert, Esq., and Ralph V. Bradbury Jr., Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: These consolidated proceedings involve the determination of deficiencies in income tax as follows: Docket
No.
Year
Deficiency
64634
1947
$38,679.44
1948
1,075.74
64872
1947
16,957.43
64873
1948
6,955.46
64943
1947
14,846.85
1948
2,169.57
64944
1951
3,870.20
64945
1948
1,810.28
64946
1947
12,978.32
*238 The issues presented for our consideration are: (1) Determination of the cost of building 90 houses sold by Biltmore Homes, Inc., in the Oakhurst Subdivision in 1947. (2) Determination of the cost of lots sold by Biltmore Homes, Inc., in 1947. (3) Determination of the cost of lots sold by Biltmore Homes, Inc., in 1948. (4) Determination of the net proceeds from sales of lots by Biltmore Homes, Inc., in 1948. (5) Whether Biltmore Homes, Inc., is entitled to an operating loss carry-over from 1947 to 1948 and if so, how much. (6) Determination of the amount of dividend income received by Charles F., James, and Frank B. Cooper from Biltmore Homes, Inc., in 1947 and 1948. (7) Determination of the fair market value of assets distributed in liquidation of Biltmore Homes, Inc., in 1948 to Charles, James, and Frank. (8) Whether Virginia, James, and Frank B. Cooper received ordinary income or capital gains upon their withdrawal of the balances in their share accounts in Perpetual Building and Loan Association of Columbia in 1948. (9) Whether $6,000 received by Charles from Cooper Motor Lines, Inc., in 1947, is taxable to him as ordinary income. (10) Whether payments totaling *239 $19,940 received by Charles in 1948 from Cooper Motor Lines, Inc., are taxable to him as ordinary income. (11) Whether interest in the amount of $3,952.24 paid by Charles and Virginia in 1948 is deductible as a business expense or as a personal expense. (12) Whether respondent properly disallowed the standard deduction claimed on the joint return of Charles and Virginia upon allowing a larger deduction including the $3,952.24 interest item mentioned above. (13) Whether the property sold by Frank B. Cooper on November 12, 1951, was used by him as his principal residence within the period of one year prior to its sale within the meaning of section 112(n) of the 1939 Code. These consolidated proceedings present 13 basic issues, some of which relate to more than one of the petitioners. For convenience and clarity of discussion, we shall set forth our Findings and discussion of each of said issues separately. Where a contested item raises a question of fact, we resolve the issue in our findings relating thereto with further explanation in our opinion to the extent that elaboration of the basis for our ultimate findings seems required. Where the contested item involves the burden *240 of proof, we likewise explain our views in our opinion. Findings of Fact Some of the facts are stipulated and, together with exhibits filed as a part of the stipulations of fact, are incorporated herein by this reference. Background and General Facts Biltmore Homes, Inc., hereinafter sometimes called Biltmore, was incorporated on or about September 17, 1946, under the laws of the State of South Carolina. Its principal place of business was at Columbia, South Carolina. Biltmore had authorized capital stock consisting of 5,000 shares, with a par value of $1 per share. The stock was subscribed and paid for in three equal parts by Frank B., Charles F., and James D. Cooper, who are brothers, (hereinafter sometimes called Frank, Charles, and James.) The officers of Biltmore, from the date of its inception to its dissolution on December 31, 1948, were as follows: Frank B. Cooper
President
James D. Cooper
Vice President and Sec-
retary and Treasurer
Biltmore filed its Federal income tax returns for the calendar years 1947 and 1948 on the cash basis with the then collector of internal revenue for the district of South Carolina. During the taxable years 1947 *241 and 1948 Biltmore had bank accounts at Homestead Bank and one at the lower Main Street Bank. Frank filed his Federal income tax returns for the calendar years 1947 and 1948, and Frank B. and Jean R. Cooper filed their joint Federal income tax return for the calendar year 1951, with the then collector of internal revenue for the district of South Carolina. James filed his Federal income tax return for the calendar year 1947, and James D. and Betty D. Cooper filed their joint Federal income tax return for the calendar year 1948 with the then collector of internal revenue for the district of South Carolina. Charles filed his Federal income tax return for the calendar year 1947, and Charles F. and Virginia P. Cooper filed their joint Federal income tax return for the calendar year 1948 with the then collector of internal revenue for the district of South Carolina. Findings (1) Cost of 90 houses in Oakhurst Subdivision to Biltmore Homes, Inc. On September 17, 1946, the corporate petitioner, Biltmore, acquired several tracts of real estate, including lots in Oakhurst, from Perpetual Building and Loan Association of Columbia (hereinafter called Perpetual), for which Biltmore paid *242 a total purchase price of $104,700. The cost of the Oakhurst lots was $48,950. Biltmore was extended credit by Perpetual for the total purchase price of the aforesaid properties. Perpetual had been chartered under the laws of the State of South Carolina on May 30, 1914. Under ruling dated October 21, 1946, Perpetual was held to be exempt from Federal income taxes as a domestic building and loan association under the provisions of section 101(4), Code of 1939. This holding was retroactively revoked on November 12, 1952. From June 1945 through 1951, the following individuals served as officers and directors of Perpetual. Charles F. Cooper
President
Frank B. Cooper
Vice President
James D. Cooper
Treasurer
Rosa M. Romanstine
Secretary
Charles was in charge of Perpetual's operations. On March 15, 1947, Simon Faust, a building contractor, (now deceased), executed an agreement wherein he agreed to build 94 houses in the Oakhurst Subdivision for Biltmore, without extras, for $5,000 per house. The agreement called for $5,100 per house with specified extras. On the same date, Frank B. Cooper, (president), executed an agreement on behalf of Biltmore purporting *243 to accept the above offer to build said houses by Faust. These two documents, together with an estimated cost breakdown signed by Faust, and an estimated cost breakdown signed by Frank, on behalf of Biltmore, were prepared for filing, and were filed, with the Federal Housing Administration, Columbia, South Carolina. The estimated cost breakdown signed by Frank showed the estimated cost of each house to be $5,352.35, and the cost of each lot to be $900, making an estimated cost for each house and lot of $6,252.35. Said contract provided, in part, as follows: * * *
"Further, in order to pay Simon Faust the sum of FIFTY-ONE HUNDRED ($5,100.00) DOLLARS for the construction and completion of each of said ninety-four houses, with the extras listed in the agreement, and in order to pay an agreed service charge of Sixty ($60.00) Dollars per case to the Perpetual Building and Loan Association of Columbia, Biltmore Homes, Inc. does hereby covenant and agree, within the next thirty days, upon demand of the said Simon Faust, to execute and deliver to the said Perpetual Building and Loan Association a note and mortgage, on FHA forms, together with all other necessary and related papers, *244 covering each of said ninety-four lots, with improvements proposed thereon, in a principal sum equal to the amount of the FHA commitment to insure the loan in each case, and to irrevocably assign the proceeds of each and all of said FHA notes and mortgages to and for the account of Simon Faust to the extent of Fifty-one Hundred ($5,100.00) Dollars of the proceeds of each such note and mortgage; provided, however, that it is fully understood and agreed that the amount hereby assigned to Simon Faust for the construction and completion, with extras, of each of said houses shall be held by the Perpetual Building and Loan Association, and disbursed to or for the account of Simon Faust, only upon the completion, with extras, of each said house, and after the final note and mortgage in each case has been insured by the Federal Housing Administration, and then only if the Perpetual Building and Loan Association has satisfactory proof Loan Association has satisfactory proof that all amounts due for labor and materials in connection with the construction of each such house, and extras, together with any and all amounts due by Simon Faust for, or on account of, construction loans or obligations *245 of every kind, have been fully paid and satisfied." * * *
James assisted his brother Frank in the negotiations surrounding the construction of the houses in the Oakhurst Subdivision by Biltmore and the transactions with Faust. On April 1, 1947, Faust and James, as president of Mutual Savings and Loan Company (hereinafter sometimes called Mutual), entered into a contract whereby Faust agreed to build 94 houses in the Oakhurst Subdivision for a charge of $4,000 per house. The houses referred to in the agreement with Mutual were the same houses on the same lots as those set forth in the contract of March 15, 1947, in which Faust agreed to build the houses for Biltmore. It was agreed that all of the 94 houses to be built under the Mutual agreement were to be substantially the same, except for reasonable variations of front elevations, as the houses on which F.H.A. commitment No. 446-00756 was issued to Biltmore Homes, Inc. The Mutual contract reads, in part, as follows: * * *
"SIMON FAUST may obtain construction money, if he so desires, under the following terms and conditions. He shall execute and deliver to Mutual Savings and Loan Company his note and mortgage in *246 the principal sum of $376,000.00, payable on demand, with interest at the rate of six per cent per annum only on the 'balance due' as hereinafter defined. Said note and mortgage shall be secured by all improvements, as made, to said ninety-four lots; also by all lumber, materials, and supplies now or hereafter placed on 'Oakhurst' or other properties of Biltmore Homes, Inc.; also by all lumber, materials, supplies, and properties of Simon Faust located elsewhere; also by the unadvanced proceeds of this note and mortgage at any time, and by any and all amounts due, or to become due, to Simon Faust pursuant to the within contract and agreement to build the aforesaid ninety-four houses and make the improvements mentioned to said lots in 'Oakhurst'. Mutual Savings and Loan Company will advance the proceeds of said note and mortgage to Simon Faust, in reasonable amounts, as construction progresses; and the actual 'balance due' at any time shall be all amounts theretofore advanced by Mutual Savings and Loan Company, Biltmore Homes, Inc., and/or Perpetual Building and Loan Association of Columbia, S.C., to, on, or for the account of Simon Faust, all of which amounts shall be secured by said *247 note and mortgage, and charged to Simon Faust against the proceeds thereof; * * *" Mutual had been granted an exemption from income tax under section 101(4), supra, under a ruling dated November 8, 1946. James was president of Mutual and was in charge of its operations. Frank, president of Biltmore, was also a shareholder of Mutual. As part of the Mutual contract, there is attached a schedule showing the dates and amounts of payments made by Mutual to Faust under the agreement. On April 1, 1947, Mutual began making payments to Faust under its contract with him to build the Oakhurst houses. From that date to October 24, 1947, Mutual paid Faust a total of $359,966.81. These payments to Faust were made through James, Frank, and Charles. On April 10, 1947, Biltmore executed and delivered 90 first mortgages to Perpetual on 90 lots and improvements in the Oakhurst Subdivision. The parties agreed that Biltmore was to receive from Perpetual the difference between the $5,100 per house (to be paid to Faust) and the face amount of the first mortgage. Perpetual agreed to finance the sale of said houses to veterans. The veterans were to assume the payment on the first mortgage and execute *248 a second mortgage to Perpetual for the 10 per cent down payment required, plus the closing cost and other incidential charges. The total of the first mortgages executed by Biltmore to Perpetual was in the amount of $472,900. There were no houses on the lots on April 10, 1947, when Biltmore executed the 90 mortgages in question. During 1947, 90 houses were constructed for Biltmore by Faust on the Oakhurst lots, which were the subject of the mortgages referred to above. Biltmore sold these houses and lots in 1947 to veterans for a total consideration of $542,051. The purchasers assumed Biltmore's first mortages (held by Perpetual) totaling $472,900, gave second mortgages to Perpetual totaling $68,713.50, and paid $437.50 in cash. The second mortgages were given to cover closing costs and other charges. Payment of the first mortgages was insured by the Federal Housing Administration. Of the $68,713.50 which was covered by second mortgages in favor of Perpetual, the sum of $33,838.45 was actually credited to Biltmore by Perpetual, which latter amount was agreed by Biltmore to be a fair and reasonable value for the nonguaranteed second mortgages. All of the 90 first mortgages on the *249 aforesaid Oakhurst property were sold by Perpetual at approximately face value between September 3, 1947, and April 28, 1948. The majority of these mortgages was sold to Burlington Savings Bank, Burlington, Vermont, and the remainder was sold to Federal National Mortgage Association. The sales price of the 90 houses and lots in the Oakhurst Subdivision ranged from a low of $5,925, paid by a $5,200 first mortgage, and a $725 second mortgage, to a high of $6,175, paid by a $5,400 first mortgage, and an $775 second mortgage. Opinion (1) Cost of 90 houses in Oakhurst Subdivision Biltmore Homes, Inc., contends that its cost of building the 90 houses which it sold during the taxable year 1947 was not less than $5,160 each, or a total of $459,000, and that it realized no profit on the over-all transaction. Respondent, in opposition, maintains that the cost of said houses was not more than $4,000 each, or a total of about $360,000, which is approximately $99,000 less than the corporate petitioner reported on its tax return for the taxable year 1947. Respondent's determination is, of course, presumptively correct, and the burden of proof is on petitioner to show error therein. We do *250 not believe that petitioner has met its burden. While the original contract between Biltmore and Faust called for a payment to Faust of $5,100 per house constructed, there is no evidence that such an amount was ever paid to Faust by Biltmore, Perpetual, Mutual, or anyone else. The total amounts paid to Faust, through Mutual, (which are the only payments to Faust as far as the record goes), aggregated $359,966.81 for the 90 houses built, or approximately $4,000 per house according to the schedule of payments attached to the Mutual contract. There is no evidence of payment of cost of construction in excess of that amount. The schedule of payments shows that these payments were made through Charles, Frank, and James, who controlled Biltmore, Perpetual, and Mutual, and were fully familiar with the arrangements. Frank was the only one of the three who testified, and his evidence totally fails to establish payments to Faust in excess of $4,000 per house. In petitioner's reply brief, it appears to be assumed (although not expressly stated) that Faust himself received only $4,000 net per house and that the difference between this amount and $5,100 per house went to Mutual "for the purpose *251 of inducing the latter to assume the great risk admittedly involved in advancing the uninsured construction money to build these ninety Oakhurst houses." There is no evidence that Mutual received the differential, or that, if received by Mutual, it represented something in the nature of a finance charge of $1,100 per house because of the financial risk. If we assume, arguendo, that Mutual did receive the differential, it merely serves to make the purpose of the manipulation more transparent. If successful, it would add to the basis of Biltmore's houses by a supposed factor of cost of construction, and, at the same time, pass along an anticipated profit from an organization (Biltmore) subject to income tax (and controlled by the Coopers) to an organization (Mutual) also controlled by the Coopers, with a ruling exempting it from income tax attended with the hope on the part of the Coopers of recapturing the profits at some future date at capital gains rates. Our speculative discussion is merely intended to indicate one of the possible manipulations which might have been the motivating force of the odd steps taken by closely held corporations controlled by the same interests. Certainly *252 transactions between members of a family, and corporations controlled by them, calculated to reallocate or reduce income invite careful scrutiny. See . The significant fact is, however, that there is no evidence of cost of construction paid by or through Biltmore, Mutual, or Perpetual, in excess of $4,000 per house, or a total of $360,000 for the ninety houses as determined by respondent. We hold, therefore, that petitioner, on this issue, has failed to meet the burden of proving error in respondent's determination. Findings (2) and (3) Cost of lots sold by Biltmore in the taxable years 1947 and 1948 On September 17, 1946, Biltmore acquired the lots listed in the following subdivisions from Perpetual for a consideration of $104,700. Subdivision
Block
Lot No.
Valencia Hills
A
9 to 11, inclusive
Valencia Hills
E
8, 9, and 14
Valencia Hills
I
6, 7, 8, and 9
Valencia Hills
J
8
Valencia Hills
M
2 to 21, inclusive
Valencia Hills
P
14 to 21, inclusive
Valencia Hills
W
2
Oakhurst
A
1 to 17
Oakhurst
B
1 to 16
Oakhurst
C
1 to 33
Oakhurst
D
1 to 22
Oakhurst
E
1 to 6
Oakhurst
Approximately 5 1/2
acres of business
property
Forest Dale
A
12 to 36, and 12 1/2 of
Lot 38
Forest Dale
B
1 to 15, inclusive
Victory Gardens
12, 28, 36, 38, 40, 42,
44, 64, 66, and 68
Claireview Terrace
6, 8, and 9
Forest Lake Estates
A
25
Forest Lake Estates
C
12
Calhoun Street
2 lots
*253 The stated consideration for the above property was computed as follows: Subdivision
Assigned Cost
Lots in Valencia Hills
$ 19,500
Lots in Oakhurst
48,950
Lots in Forest Dale
18,750
Lots in Victory Gardens
4,000
Lots in Claireview Terrace
1,500
Lots in Forest Lake Estates
2,000
Calhoun Street
10,000
$104,700
Biltmore was extended credit by Perpetual for the $104,700 purchase price of the aforesaid properties. On December 31, 1948, Biltmore deeded the following property to Mutual: DESCRIPTION OF PROPERTY
Valencia Hills Subdivision
Block A
Lots 9 to 11,
inclusive
Block B
Lot 11
Block E
Lot 14
Block I
Lot 9
Block J
Lot 8
Block M
Lot 8
Block P
Lot 14
Block P
Lot 15
Block P
Lot 16
Block P
Lot 17
Oakhurst C
Lot 7
Oakhurst C
Lot 8
Oakhurst C
Lot 19
Oakhurst C
Lot 20
Victory Gardens Subdivision
Lot 12
Lot 28
Lot 36
Lot 40
Lot 42
Lot 44
Lot 66
Forest Dale Subdivision
12 1/2 strip of land
The above property was transferred to Mutual for the amount that it had cost Biltmore. On December 14, 1946, Biltmore transferred 18 lots in Valencia Hills Subdivision to Manor *254 Construction Company. On October 25, 1948, Biltmore purchased Lot 11, Block B, Valencia Hills Subdivision for $398.26. The unrecovered cost of lots of Biltmore as of December 31, 1946, was $93,707.25, and the cost of lots sold by Biltmore in 1947 was $83,246.76. The unrecovered cost of lots of Biltmore as of December 31, 1947, was $10,460.49, which amount was the cost of lots sold by Biltmore in 1948. Opinion (2) and (3) Cost of lots sold by Biltmore in the taxable years 1947 and 1948 Respondent determined that the cost of the lots sold by Biltmore Homes, Inc., in 1947, did not exceed a total of $79,912.50, and that the lots sold in 1948 cost $5,500. He urges that the total cost of the land sold by Biltmore during 1947 and 1948, was $85,412.50, which is $8,294.75 less than the balance of petitioner's land cost as reflected on its ledger sheet, entitled "Real Estate" for December 31, 1946, in the amount of $93,707.25. Petitioner urges that the cost of all of said property sold in 1947 totaled $83,246.76 ($93,707.25 less $10,460.49), and that the cost of the property sold in 1948 totaled at least $10,460.49, or an aggregate cost of $93,707.25, as reported in its returns for *255 said years. As shown by our Findings, we sustain petitioner's contention on this issue. The burden of proof is, of course, on petitioner, but we think it has discharged this burden largely on the strength of Exhibit 55 (filed as a part of the stipulation of facts) which includes the original ledger sheets of Biltmore on accounts entitled "Real Estate" and "Expense" covering the period of its incorporation through the year 1948. Opinion (4) Income from sale of lots by Biltmore in taxable year 1948 Respondent determined that Biltmore received net proceeds from the sale of lots in 1948 in the amount of $11,437.70, that their cost was a total of $5,500, and that expenses of said sale were $508.62, or an aggregate of $6,008.62. In its petition, Biltmore contends that the actual cost of the aforesaid lots totaled at least $10,460.49 ($4,960.49 more than respondent determined) and that the actual net proceeds from such sales did not total more than $10,112.70. On its return for 1948, Biltmore reported net proceeds from the sale only in the amount of $11,037.70, which is $400 less than that determined by respondent. Petitioner, on brief, [p. 2] concedes that its return failed to *256 show the aforesaid $400, but avers that this was harmless error since the same tax return also failed to show the corresponding cost of $400. We have already determined under Issues (2) and (3) of our Findings and Opinion, supra, that the cost of the lots in question was $10,460.49, and to this extent, we sustain petitioner. Petitioner has failed to meet the burden of proving error in respondent's determination of the proceeds of the sale of the lots and in this respect we affirm respondent. Opinion (5) Operating loss carry-over from 1947 to 1948 Biltmore did not claim an operating loss carry-over on its income tax return for the year 1948, but alleged in its petition that it is entitled to such deduction in the amount of at least $8,734.26, as a loss carry-over from 1947. Respondent determined that Biltmore realized net income in 1947 in the amount of $101,788.01. In view of our holding on Issue (1), supra, to the effect that petitioner had not established cost of construction in 1947 of the 90 houses in the Oakhurst Subdivision in excess of $360,000, it is apparent that petitioner has not established a net operating loss for that year. Opinion (6) Dividend from Biltmore *257 to the Cooper brothers We have found, supra, that during 1947, 90 houses, constructed for Biltmore by Faust, were sold by Biltmore for a total consideration of $542,051; that the purchasers assumed Biltmore's first mortgages (held by Perpetual) totaling $472,900, gave second mortgages to Perpetual totaling $68,713.50, and paid $437.50 in cash; and that the second mortgages were given to cover closing costs and other charges. We have further found that of the $68,713.50 which was covered by second mortgages in favor of Perpetual, the sum of $33,838.45 was actually credited to Biltmore by Perpetual; and that all of the 90 first mortgages on the aforesaid Oakhurst property were sold by Perpetual at approximately face value between September 3, 1947 and April 28, 1948. Under Issue (1), we held that petitioner had failed to establish cost of construction of the 90 Oakhurst houses in excess of $360,000, or $4,000 per house. Under Issues (2) and (3), we made adjustments in respondent's determination of cost of lots sold, which adjustments (favorable to petitioners) will serve to reduce the amount of dividends here in issue, to an extent readily determinable in the computation under *258 Rule 50. Charles, Frank, and James were all officers and directors of Perpetual with Charles being in charge. In addition, they controlled Mutual, and were the sole officers and stockholders (in equal shares) of Biltmore. Biltmore entered into a contract with Faust wherein Biltmore agreed to execute and deliver to Perpetual a note and mortgage covering each of 94 lots in the Oakhurst Subdivision with improvements proposed thereon, in the aggregate amount of $472,900, and to irrevocably assign the proceeds thereof to the account of Faust. About two weeks later, James, on behalf of Mutual, entered into a contract with the same builder (subcontractor) to build the same houses on the same lots for $4,000 each. James had previously assisted his brother, Frank, in the negotiations whereby Faust was to build said houses on the same lots for Biltmore. In the separate statutory notices applicable to each of the taxable years 1947 and 1948, respondent determined that during said years $90,813.34 and $10,355.59, respectively, of Biltmore's income was diverted to other corporations for the benefit of Biltmore's stockholders, thereby resulting in dividends from Biltmore to Charles, James, and *259 Frank in equal amounts since each owned one-third of Biltmore's stock. On its tax return for 1947, Biltmore reported no net income at all. On its 1948 return it reported net income of $347.33. In the statutory notice applicable to Biltmore for 1947 and 1948, respondent determined that it realized taxable net income in the respective amounts of $101,788.01 and $5,429.08 for said years. Respondent's determination is, of course, prima facie correct. In order to explain the basis of such determination, respondent called to the stand the Technical Adviser of the Appellate Staff who had made the analysis and calculation on which the statutory determination was based. While his computation and analysis did not purport to be based upon evidentiary facts, admissible in a court of law, (and it was not required to be) it did establish that the statutory determination was based upon a clearly reasoned approach and was not arbitrary. Stripped of minor items which do not require discussion here, it is apparent that the aura of mystery surrounding the problem of whether the Cooper brothers received from Biltmore, directly or indirectly, and constructively or otherwise, a substantial amount *260 of taxable dividends, revolves around what happened to the differential between the $5,100 per house which Biltmore and the petitioners claim to have been paid to Faust as construction costs (but unsupported by the record) and the $4,000 per house actually paid to Faust by Mutual. We think the statutory notices were clearly sufficient to put the Cooper brothers on notice of respondent's position, and the Coopers apparently agree, because they have claimed no surprise, and did not ask for a further or better statement under our Rule 17(c)(1). Moreover, the testimony of the technical adviser at least made the practical issue abundantly clear. In spite of the foregoing, and knowingly bearing the burden of proof, the Coopers wholly failed to dispel the mystery as to what entity paid the differential (if it was ever paid), what entity or person received the differential, and for whose benefit. It is true that Frank testified that all he and his brothers received from Biltmore was approximately a total of $5,000 at the time of liquidation of Biltmore, and that this represented the approximate cost of their investment in Biltmore. Upon the record, and upon our observation of the witness, *261 we cannot accept this testimony as true. It is obviously in his own interest, and is in no way supported by surrounding circumstances showing the disposition of the assets of Biltmore, or the payment, receipt, or disposition of the differential above referred to (if it was ever paid, received, or disposed of). Moreover, neither Charles nor James, the other stockholders and officers of Biltmore and petitioners on this issue, took the stand to corroborate Frank. While their testimony would also be subject to scrutiny because of their obvious interest, it may have thrown valuable light on the picture. Since they did not choose to testify, we can hardly assume that their testimony would have helped their cause. For completeness, we again refer to the control of the Coopers over Biltmore, Perpetual, and Mutual. On the record before us, we cannot solve the mystery for the parties, and respondent is not required to do so. Since the mystery is not solved, the onus falls upon the Cooper brothers, who bear the burden of proof. We, accordingly, sustain respondent, subject to adjustment in the amount of the dividends reflecting our determination of cost of lots sold under Issues (2) and *262 (3), supra, and any other adjustments which result mechanically from our holding, all of such adjustments to be made as a part of the computations under Rule 50. Opinion (7) Fair market value of assets distributed in liquidation of Biltmore in 1948 to the Cooper brothers In the statutory notices applicable to the individual petitioners, Charles, Frank, and James, for 1948, respondent determined that each received a long-term capital gain of $2,157.25 upon the receipt of one-third of assets having a fair market value of $11,471.75 on the liquidation of Biltmore Homes, Inc. In respondent's computation, he deducted the total basis of the capital stock of the three stockholders ($5,000) from the determined value of the assets distributed ($11,471.75), and attributed one-third of the long-term capital gain ($6,471.75), or $2,157.25 to each of the three Cooper brothers. The only issue raised by the individual petitioners with respect to respondent's determination is the proper fair market value of the assets which were distributed upon the liquidation of Biltmore Homes, Inc. The burden of proof rests with the petitioners. The only evidence adduced by petitioners was that of Frank, *263 whose testimony was uncertain and confused. He indicated that about $5,000 in cash was available for distribution in addition to the proceeds of the sale of real property to Mutual. The amount of the proceeds of the sale to Mutual is not disclosed. He was not clear as to what, if any, additional assets were distributed. The indications were that he had little recollection of the subject matter, and his evidence was clearly insufficient to establish error in respondent's determination. Finding (8) Nature of gain realized upon withdrawal of balance of share accounts from Perpetual by Virginia, James, and Frank B. Cooper During the years 1945 to 1951, James and Frank held prepaid installment share accounts with Perpetual. Virginia Cooper held such accounts with Perpetual during the years 1945 to 1948, inclusive. The holders of such accounts were issued passbooks to reflect the status and ownership of their accounts. No stock certificates were issued. Each account had an ultimate maturity value toward which the holder made deposits. Credits were also made to the accounts by Perpetual. During the years their accounts were in existence, Perpetual entered credits thereto at various times *264 of amounts representing dividends due to each of the accounts from Perpetual's earnings. Section 1(e) of Article Three of Perpetual's bylaws required that all dividends due prepaid installment share accounts be credited to the account until the ultimate maturity value of the account was reached. Dividends credited to the account could not be paid to the holder until the account matured or until the account was surrendered in its entirety to Perpetual for repurchase. Perpetual's share accounts were transferable only on its books and then only upon proper application of the transferee and the acceptance of the transferee as a member upon terms approved by its board of directors. On October 17, 1948, James withdrew the balances in share accounts No. 3 through 7 with Perpetual and was paid $30,000. He reported the gain of $25,000 ($30,000 less $5,000 basis) on the 1948 joint Federal income tax return he filed with his wife as a long-term capital gain on the sale of five shares of Perpetual's stock. Respondent determined that the entire gain of $25,000 (representing dividends which had been credited to the accounts) constituted ordinary income in the years withdrawn, that is, 1948. *265 On October 18, 1948, Frank withdrew the balances in share accounts No. 3 through 5 with Perpetual and was paid $18,000. He reported the gain of $15,000 ($18,000 less $3,000 basis) on his 1948 Federal income tax return as a long-term capital gain on the sale of three shares of Perpetual stock. Respondent determined that the entire gain of $15,000 (representing dividends which had been credited to the accounts) constituted ordinary income in the year 1948. During 1948 Virginia Cooper withdrew the balances in her share accounts with Perpetual and was paid $24,725.40. She reported the gain of $20,725.40 ($24,725.40 less $4,000 basis) on the joint Federal income tax return filed by her and her husband, Charles, for 1948 as a long-term capital gain on the sale of four shares of Perpetual's stock. Respondent determined that the entire gain of $20,725.40 (representing dividends which had been credited to her accounts) constituted ordinary income in the taxable year 1948. Opinion (8) Nature of gain realized upon withdrawal of balance of share accounts from Perpetual by Virginia, James, and Frank B. Cooper During the taxable year 1948, Virginia, James, and Frank, received the amounts *266 of $24,725.40, $30,000, and $18,000, respectively, from Perpetual. Each reported the difference between the amount received and their basis as a long-term capital gain on the sale of stock. Respondent determined that the entire gain represented dividend credits to each account which were includible as ordinary income in the taxable year withdrawn, 1948. The only question presented is whether the gains are taxable as ordinary income or capital gain within the meaning of section 117(a)(1) of the 1939 Code. A dividend which is taxed as ordinary income is defined as any distribution by a corporation to its shareholders out of its current earnings or profits or out of profits of prior years. Section 115(a). This rule applies to building and loan associations in the same manner as it does to corporations with the dividend being subject to tax when unqualifiedly made subject to the demand of the shareholder. Regs. 111, sec. 29.42-3. [2] See (C.A. 2, 1945) (appeal dismissed).
*267 The record shows that the amounts in question had been declared as "dividends" by Perpetual out of its earned income in the years the accounts were in existence. Although the dividends had been credited to the respective accounts, under the bylaws of Perpetual, said dividends could not be paid to the petitioners until the account matured or until it was surrendered in its entirety. Hence, there was no constructive receipt of the dividends until each of the petitioners surrendered his account in full in 1948 and the dividends did not become subject to taxation until that time. Sec. 29.42-3 and Estate of Bertha May Holmes, both supra. It is clear that the individual petitioners herein did not sell any stock, and also that they had none to sell. All that each had was a passbook showing the status of his accounts. These accounts did not represent stock in the usual connotation of the word. They were, in effect, share accounts, with accumulations credited to them by the building association, representing their respective shares of its earnings. By surrendering the passbook and withdrawing the account in full, each acquired the amount that had been credited to his account representing *268 his deposits and his share of the distributions of profits by Perpetual. If it had not been for the restrictions on their rights to withdraw the amounts credited as "dividends," petitioners would have been taxed at ordinary rates on such "dividends" when the credits were entered. The fact that credits made on the shares were referred to on the books of the building association or considered by its members as "stock dividends" is immaterial. Book entries or terminology in corporate bylaws, while of some evidentiary value, are not determinative. , affd. (C.A. 9, 1932). Whether the amounts credited to the respective accounts representing a share of Perpetual's earnings be called dividends, profits, interest, or by any other convenient term, it is clear that they represented ordinary income taxable as such and not capital gains. See , affd. (C.A. 3, 1933); . Petitioners' argument, on brief, that the facts set forth on a transcript of Perpetual's *269 ledger designated "Prepaid Installment Share Accounts" in which the balance of their respective accounts is treated as long-term capital gain have been stipulated as correct by respondent is without merit. Examination of the stipulations involved shows merely that the parties agreed to accept the aforesaid transcript as having been taken from Perpetual's books and records, and not that respondent had admitted the correctness of Perpetual's treatment of the "dividends" attributed to each of the petitioners as long-term capital gain. In the light of the foregoing, and the record as a whole where applicable to this issue, we hold that respondent's determination is correct. Findings (9) and (10) Amounts received by Charles from Cooper Motor Lines, Inc., in 1947 and 1948 Cooper Motor Express, Inc., was a South Carolina corporation organized in 1938 for the purpose of conducting a motor transportation business under the regulations of the Interstate Commerce Commission. On February 28, 1942, Cooper Motor Express, Inc., had outstanding 300 shares of capital stock (par value $10 per share) which was owned as follows: Paul A. Cooper
50 shares
Frank B. Cooper
50 shares
Edwin H. Cooper
50 shares
James D. Cooper
50 shares
Wm. P. Cooper, Jr.
50 shares
Charles F. Cooper
50 shares
*270 On March 5, 1942, James D. and Charles F. Cooper, acting on behalf of Cooper Motor Express, Inc., entered into a contract with C. G. Fuller and Calhoun Lemon whereby the operating assets of Cooper Motor Express, Inc., together with certain liabilities, were transferred to a new corporation, Cooper Motor Lines, Inc. As part of the agreement, the parties agreed that the stockholders represented by the Coopers would receive a 40 per cent interest which they would divide among the shareholders. The contract also provided for Cooper Motor Lines, Inc., to pay a certain percentage of its gross receipts to Cooper Motor Express, Inc., its successors and assigns. Said contract of March 5, 1942, was amended by a "Memorandum Agreement" also dated March 5, 1942, but recorded on November 22, 1943, on the records of Richland County, South Carolina. This "Memorandum Agreement" provided for increased payments by Cooper Motor Lines, Inc., to Cooper Motor Express, Inc., if and when the Interstate Commerce Commission granted Cooper Motor Lines, Inc., a certificate. The amounts to be paid were to be calculated on a sliding scale of percentage of gross receipts, ranging from five per cent on the first *271 $500,000, to ten per cent on those in excess of $1,000,000, during each fiscal year. After the transfer of assets and liabilities on March 5, 1942, to Cooper Motor Lines, Inc., as set forth above, Cooper Motor Express, Inc. became inactive. Its assets and liabilities at that time were as follows: Assets: Cash
$ 24,000.00
800 shares stock in new corpo-
ration
16,000.00
Accounts receivable
28,478.47
Accounts due from Cooper Mo-
tor Lines
4,593.88
Note due by Cooper Motor
Lines
11,567.11
Real Estate
15,756.59
Deficit
53,509.82
$153,905.87
Liabilities: Accounts payable
$ 33,825.25
Notes payable
117,080.62
Capital stock
3,000.00
$153,905.87
On January 1, 1943, Charles acquired the above assets, including the aforesaid contract with Cooper Motor Lines, Inc., and assumed the liabilities of Cooper Motor Express, Inc. Charles received the assets and the contract in return for assuming the liabilities. On November 1, 1945, Charles and Cooper Motor Lines, Inc., changed the terms of the aforesaid contract between Cooper Motor Lines, Inc., and Cooper Motor Express, Inc., the assets of which had previously been acquired by Charles F. Cooper. *272 The change was in respect to the amount of certain "franchise royalties" to be paid Charles under the contract he had acquired. Charles received the following amounts from Cooper Motor Lines, Inc. under the terms of the contract acquired by him from Cooper Motor Express, Inc., on January 1, 1943: Year
Amount
1944
$ 4,264.62
1945
20,000.00
1946
13,333.33
1947
6,000.00
1948
19,940.00 The amount received in 1944 was reported as ordinary income on Charles' 1944 income tax return. Opinion (9) Amount received by Charles from Cooper Motor Lines, Inc., in the taxable year 1947 is ordinary income During 1947 Charles received payments totaling $6,000 from Cooper Motor Lines, Inc., pursuant to a contract between Cooper Motor Lines, Inc., and Cooper Motor Express, Inc., which (contract) he had acquired in 1943. Charles reported the receipt on his 1947 return but alleged that none of it was taxable on the ground that the entire amount of $6,000 represented a partial recovery of his "cost" in the contract under which the payments were received. Respondent determined that the entire $6,000 was taxable to him as ordinary income in 1947 since his cost basis in the *273 contract had been recovered in prior years. In essence, it is petitioner's position that the cost basis in the contract was the same as the "net deficit" of Cooper Motor Express, Inc., in the amount of $53,509.82, which he assumed and paid in consideration for said contract. He argues further that the aforesaid $6,000 was received as part payment for the cancellation of the contract in question, that said amount was a partial recovery of the cost of said contract and not taxable income; and that if any of said amount was taxable, since the contract was a capital asset, the $6,000 constituted long-term capital gain under section 117(a)(1), supra. As already stated in our Findings, Charles acquired the contract along with other assets consisting of cash, shares of stock, accounts receivable, notes receivable, and real estate on January 1, 1943, in return for assuming the liabilities of Cooper Motor Express, Inc., which totaled $153,905.87 at that date. There is no indication in the stipulation of the parties that the asset designated "deficit" in the amount of $53,509.82 refers to the cost basis of the aforesaid contract. We observe that in his petition, Charles alleges that the *274 "net cost" of said contract was $41,281.19. It is well settled that where several pieces or items of property are acquired en bloc, for a lump sum consideration, and subsequently disposed of a portion at a time, there must be an allocation of the cost of the whole over the several pieces or units if such an allocation is not wholly impracticable. Cf. ; . Petitioner has not shown what portion, if any, of the cost of the group of assets (for which he assumed total liabilities in the amount of $153,905.87) is allocable to the contract. Nor has he shown that such an allocation is impracticable and that his cost was some other definite amount computed in a different manner. A taxpayer cannot establish error in the respondent's determination as to basis where he presents no evidence to establish a different basis. . Without proving the cost of the contract which Charles urges he was still recovering in the taxable year 1947, he cannot overcome the burden of showing that respondent erred in his determination that the cost *275 of the contract involved had been previously recovered. It is clear that the amount in question ($6,000) was not received by Charles as a result of any sale or exchange, but, rather under the terms of the contract with Cooper Lines, Inc. We hold, therefore, that section 117, supra, is inapplicable and the full amount of $6,000 is taxable to petitioner as ordinary income. . Accordingly, we sustain respondent on this issue. Opinion (10) Amount received by Charles from Cooper Motor Lines, Inc., in the taxable year 1948 is ordinary income During the taxable year 1948 Charles received payments totaling $19,940 from Cooper Motor Lines, Inc., pursuant to the contract discussed under Issue (9), supra. On his return for 1948, Charles deducted $398.77 as his cost of the contract and reported 50 per cent of the remaining $19,541.23 as long-term capital gain. Respondent determined that petitioner's cost of the contract had been recovered in prior years and that the entire $19,940 constituted ordinary income since the amount received did not represent gain from the sale or exchange of a capital asset as contemplated by section 117, *276 supra. Petitioner, in opposition, contends that $14,176.49 of the aforesaid amount ($19,541.23) was not taxable income in 1948 because it represented part payment for the cancellation of the contract and was a partial and final recovery of the cost of the contract. He argues further that $5,763.51 of said amount, and any other part of the $19,940, if any, which we may decide was not attributable to cost, was long-term capital gain under section 117, supra. Again the burden of proof is on petitioner to show the amount of his cost basis in the contract and the amount, if any, that had been recovered. For the reasons stated hereinabove in Issue (9), we hold that petitioner has failed to meet this twofold burden, and that the full amount of $19,940 is taxable to him in 1948 as ordinary income. Burnet v. Houston and Joseph A. Guthrie, both supra. Opinion (11) and (12) Nature of interest in the amount of $3,952.24 paid by Charles and Virginia in 1948 On their joint return for 1948 Charles and Virginia claimed a standard deduction in the amount of $1,000. They also claimed $3,952.24 interest paid to Perpetual as a business deduction. In their petition, they aver that said amount *277 had been paid in 1948 to Perpetual on a certain note and mortgage covering business properties from which they received rent during the taxable year 1948. Respondent determined that the $3,952.24 represented a personal expense and disallowed it as a business expense in determining adjusted gross income. The respondent, however, allowed the petitioners itemized deductions of $4,485.78 in determining net income in lieu of the $1,000 standard deduction claimed on the return. One of the items entering into the $4,485.78 was the $3,952.24 interest payment. Petitioners offered no evidence in support of their contention that the interest was a business expense. No extended discussion on this issue is required since petitioners have failed to meet the burden of proof of error in respondent's determination. Finding (13) Residence sold by Frank in the taxable year 1951 In 1945, Frank resided with his mother and father at 319 North Trenholm, Columbia, South Carolina. He acquired title to the property in 1946. Frank married in September 1949, and he and his wife moved to a rented house. They continued to live at this place until they moved to 100 Country Club Drive, Columbia, South Carolina, *278 on or about November 10, 1951. Frank began constructing the house at 100 Country Club Drive in 1951 and completed it on or about November 10, 1951, at a cost in excess of $30,000. He sold the residence at 319 North Trenholm Road on or about November 12, 1951, to his mother for $30,000. His mother continued to live at that place after Frank and his wife moved in September 1949. The residence at 319 North Trenholm Road had a cost basis of $10,400. Opinion (13) Residence sold by Frank in the taxable year 1951 Petitioner contends that his gain on the sale of a house to his mother in 1951 is not to be recognized under section 112(n) of the 1939 Code. [3] In essence, he argues that he did not intend to change his principal residence from his "old" residence located at 319 North Trenholm Road, until he decided to build his "new" residence in February 1951. Respondent on the other hand, urges that petitioner is not entitled to the relief afforded by section 112(n) because at the time he sold his old home it had not been used by him as his "principal residence" within the period of one year prior to its sale. *279 Whether or not the property was used by petitioner as his principal residence depends upon all of the facts and circumstances. Regs. 111, sec. 29.112(n)-1. The core of the problem is to determine whether the old residence was "used by the taxpayer as his principal residence" within the period of one year prior to its sale. We are mindful that section 112(n)(1) may apply despite the fact that the old residence was not being occupied as petitioner's principal residence at the time he sold said property since the statute contemplates that a new residence may be acquired and occupied as long as 12 months prior to the sale of the old residence property. . We think it is clear from the record that after Frank was married and moved out of 319 North Trenholm in September 1949, 319 North Trenholm ceased to be his residence. He did not occupy it at all after that time, and the possibility that he might occupy it thereafter was at best conjectural since it would admittedly have been contingent on his mother moving out. This contingency did not occur. We, of course, realize that Frank, in his testimony, referred to 319 North Trenholm as *280 his principal residence for the period from September 1949 until November of 1951, and referred to the rented property occupied by himself and his wife during that period as a temporary residence. It is clear, however, that the use of these words merely represented his own legal conclusions. After careful consideration of all of the circumstances disclosed by the record, we hold that section 112(n) does not apply to the sale of his house and the gain thereon is, therefore, to be recognized as determined by respondent. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: Charles F. Cooper, Docket No. 64872; Charles F. Cooper and Virginia P. Cooper, Docket No. 64873; Frank B. Cooper, Docket No. 64943; Frank B. Cooper and Jean R. Cooper, Docket No. 64944; James Cooper and Betty D. Cooper, Docket No. 64945; and James Cooper, Docket No. 64946.↩
2. SEC. 29.42-3. EXAMPLES OF CONSTRUCTIVE RECEIPT. * * * An amount credited to shareholders of a building and loan association, when such credit passes without restriction to the shareholder, has a taxable status as income for the year of the credit. If the amount of such accumulations does not become available to the shareholder until the maturity of a share, the amount of any share in excess of the aggregate amount paid in by the shareholder is income for the year of the maturity of the share. * * *↩
3. SEC. 112. RECOGNITION OF GAIN OR LOSS. (n) Gain From Sale or Exchange of Residence. - (1) Nonrecognition of Gain. - If property (hereinafter in this subsection called "old residence") used by the taxpayer as his principal residence is sold by him and, within a period beginning one year prior to the date of such sale and ending one year after such date, property (hereinafter in this subsection called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's selling price of the old residence exceeds the taxpayer's cost of purchasing the new residence.↩